775 S.E.2d 90

**CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC, and Melvin Lager, Defendants Below, Petitioners**

v.

**Sharon GRIFFITH and Lou Ann Wall, Plaintiffs Below, Respondents.**

No. 13–1084.

Supreme Court of Appeals of West Virginia.

Submitted April 7, 2015.

Decided June 10, 2015.

Ancil G. Ramey, Esq., Christopher Slaughter, Esq., Steptoe & Johnson, PLLC, Huntington, WV, for Petitioners.

Walt Auvil, Esq., Michele Rusen, Esq., Rusen & Auvil, PLLC, Parkersburg, WV, for Respondents.

W. Henry Jernigan, Jr., Esq., Jill Cranston Rice, Esq., Andrew T. Kirkner, Esq., Dinsmore & Shohl, LLP, Charleston, WV, for Amicus Curiae West Virginia Chamber of Commerce.

Lonnie C. Simmons, Esq., DiTrapano, Barrett, DiPiero, McGinley & Simmons, PLLC, Charleston, WV, for Amici Curiae West Virginia Foundation for Rape and Information Services, American Civil Liberties Union of

West Virginia Foundation, West Virginia Employment Lawyers Association, WV Free, and West Virginia Association for Justice.

BENJAMIN, Justice:

Petitioners, Constellium Rolled Products Ravenswood, LLC ("Constellium" or "the company") and Melvin `Lager (hereinafter "CEO Lager" or "the CEO") appealed the September 3, 2013, final order of the Circuit Court of Jackson County. In its order, the circuit court denied Constellium's post-trial motion for judgment as a matter of law or for a new trial following a jury trial. The jury awarded respondents Sharon Griffith and Lou Ann Wall compensatory damages in the amount of $250,000 each and punitive damages in the amount of $250,000 each for their hostile work environment claims.

By a memorandum decision filed on October 17, 2014, this Court affirmed the circuit court's denial of the petitioners' post-trial motion. The petitioners subsequently filed a petition for rehearing. This Court granted the petition for rehearing and also permitted the parties to file supplemental briefs specifying the precise facts that support their positions on the issues of punitive damages and whether the petitioners' wrongful conduct was based upon the respondents' gender.

Based upon the parties' supplemental briefs and oral arguments, the designated appendix record, and the pertinent authorities, we affirm the circuit court's final order to the extent that it denied the petitioners' motion for judgment as a matter of law or for a new trial on the issue of the award of compensatory damages.[1] However, we reverse the circuit court's order to the extent that it denied the petitioners' motion for judgment as a matter of law or for a new trial on the issue of the award of punitive damages.

## I. FACTS

Respondents Griffith and Wall are long-time employees of Petitioner Constellium which is located in Ravenswood, West Virginia. Petitioner Melvin Lager was the CEO of Constellium at the time of the events in this case. Ms. Griffith and Ms. Wall work in the Project Maintenance Department where they are the only two females among seventeen employees.

From September 2009 until February 2010, the company had a suggestion box into which employees could submit comment cards anonymously.[2] The company's policy was, to post the comments from every comment card submitted after the cards were retyped and the names of individual employees redacted. Also posted with the comment cards were the CEO's response to each comment. Specifically, the original hand-written comment cards, with redactions, were posted on a bulletin board beside the redacted, typed versions with the typed response of CEO Lager. The bulletin board was located at the entrances of the plant where the comments and responses could be read by all of Constellium's employees, contractors, and vendors coming into and leaving the plant. Evidence was adduced at trial below that in October 2009, approximately 43 employee comments with the corresponding CEO responses were posted on the bulletin board.

On or about October 12, 2009, a Constellium employee, Larry Keifer,[3] wrote three comment cards about Ms. Griffith and Ms. Wall which were subsequently posted on the bulletin board with the response of CEO Lager. These cards stated as follows:

---

1. This Court acknowledges the briefs of amici curiae. The West Virginia Chamber of Commerce filed a brief in support of the petitioners, and in support of the respondents the West Virginia Foundation for Rape and Information Services, American Civil Liberties Union of West Virginia Foundation, West Virginia Employment Lawyers Association, WV Free, and West Virginia Association for Justice filed a brief. This Court has considered the arguments of amici curiae in our decision herein.

2. At trial, CEO Lager stated that the purpose of the comment cards was "to try to get the cooperation between the management, the leadership, the salary workforce, and the people working on the shop floor, to make sure everybody could come together to try to turn and save the business."

3. The respondents initially named Mr. Keifer as a party to the lawsuit, but he was voluntarily dismissed during the underlying litigation.

(1) Ask _____ supervisor what he had his crew doing in Project Maintenance on Oct. 9th on evening shift! I understand Project has at least 3 extra buggies. One of their buggies was missing on that shift I understand.: _____ (hourly employee) and another lady spent 4 hours hunting for that missing buggy. They (Project) had no supervision that evening; seems like lazy a_____ like them don't need to be here especially on overtime looking for one of their extra buggies. They need to give up their extra buggies to Plate dept. maint. So they don't have to walk and carry their tools.

CEO RESPONSE:

This doesn't seem to be the best use of time or equipment.

(2) Lazy a___ _____ (employee) was here on overtime again on Saturday, 9th doing "Nothing." Smoking cigarettes and drinking coffee again and sitting on her a___ in the lunchroom. This is b____ s____. And will be here on Sunday on double time 10th doing the same!

CEO RESPONSE:

We need everyone fully engaged and productive.

(3) _____ (employee) (Project Maint.) comes in on weekends to work (overtime) time and a half on Saturdays and double time on Sundays and sits on her a___ both days in the lunchroom and does "Nothing." "This is b____ s____". I'm tired of carrying her big lazy a___ around. This is not fair to the company or the union workers. If the lazy worthless b_____ can't do the work she needs to stay home. She comes in here and drinks coffee and smokes cigarettes all weekend. Stop this s____.

CEO RESPONSE:

As I responded to a similar comment, we need everyone to be fully engaged and productive.

Although the respondents' names were redacted from the comments that were posted on the bulletin board, the references to two women in the Project Maintenance Department were understood as identifying the respondents. Also, the parties agree that although the offensive terms in the comments were partially redacted, these terms were readily identifiable. At trial, the company acknowledged that the redactions "could have been done more effectively," given that the redactions did not keep the respondents from being identified. After the union complained about the comments, the company immediately removed them. The comments appeared on the bulletin board for two or three days. In addition to being posted on the bulletin board, there was very brief testimony by one witness that the comments were placed on the company's intranet.[4] There was additional testimony that after the comments were removed from the bulletin board, the comments were copied and passed around at lunch tables, taped to the walls and shower room, and circulated around the plant. The respondents also presented general testimony that prior to the postings of the comments, the atmosphere at work was friendly. After the postings, however, respondents were shunned by co-workers and the atmosphere became one of "male against female."

The respondents filed their complaint against Constellium in February 2011 in the Circuit Court of Jackson County alleging gender discrimination in violation of the West Virginia Human Rights Act, W. Va.Code §§ 5–11–1, et seq. The respondents subsequently amended their complaint to allege claims for sexual harassment based on a hostile work environment. A three-day jury trial was conducted in December 2012, upon the conclusion of which the respondents were awarded $250,000 each for emotional distress as compensatory damages and $250,000 each in punitive damages, for a total verdict against Constellium in the sum of $1,000,000. Constellium timely filed post-trial motions for judgment as a matter of law or for a new trial, and requested a review of the punitive damages award. By order entered September 3, 2013, the circuit court denied Constellium's motions. Constellium appealed to this Court. In an October 17, 2014, memoran-

---

**4.** The company's intranet was described at trial as the company's internal electronic communication system.

dum decision, this Court affirmed the circuit court's order. We subsequently granted the petitioners' petition for rehearing which we will now consider.

## II. STANDARD OF REVIEW

■■■ This is an appeal of a circuit court order that denied the petitioners' motion for judgment as a matter of law or for a new trial. This Court has held that "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. pt. 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009). Further, "[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). In addition, we are called upon to to review the propriety of granting punitive damages in this case. In doing so, we are mindful that

[w]hen reviewing an award of punitive damages in accordance with Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996), this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.

Syl. pt. 16, *Peters v. Rivers Edge Min., Inc.*, 224 W.Va. 160, 680 S.E.2d 791 (2009). Having set forth the proper standards of review, we now proceed to consider the issues herein.

## III. ANALYSIS

### A. Sufficiency of Evidence of Hostile Work Environment

■■■ As noted above, the respondents brought their action under the Human Rights Act as a claim for sexual harassment based on hostile work environment. This

Court has explained that "[t]he West Virginia Human Rights Act, W. Va.Code, 5–11–9(1) (1992), imposes a duty on employers to ensure that workplaces are free of sexual harassment from whatever source." Syl. pt. 8, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995). We further have indicated that

[a]n employee may state a claim for hostile environment sexual harassment if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment.

Syl. pt. 7, *Id.* The elements of a hostile environment sexual harassment claim are as follows:

To establish a claim for sexual harassment under the West Virginia Human Rights Act, W. Va.Code, 5–11–1, *et seq.*, based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

Syl. pt. 5, *Id.* Having reviewed the applicable law, we now proceed to consider the petitioners' assignments of error.

■■■ The petitioners' first assignment of error challenges the second and third factors in syllabus point 5 of *Hanlon*. Specifically, the petitioners assert that the evidence at trial clearly establishes that the allegedly wrongful conduct was not based upon the respondents' gender but was directed at their perceived work ethic. Also, the petitioners aver that the acts complained of by the respondents completely fail the "severe and pervasive" test for a hostile work environment.

In support of their argument, the petitioners contend that the gist of Mr. Keifer's comments about the respondents is in regard to their work ethic. Specifically, Mr. Keifer

characterized the respondents as earning overtime wages for doing nothing but sitting around smoking cigarettes and drinking coffee. Second, the petitioners note that CEO Lager's responses to Mr. Keifer's comments made no reference whatsoever to gender. Third, the petitioners point to Mr. Keifer's testimony at trial that it was the respondents' actions, not their gender, that caused him to write the comments. Next, the petitioners cite numerous cases from other jurisdictions which they say support the proposition that statements about an employee's work ethic, including the term "lazy," are insufficient to support a claim for hostile work environment discrimination even if the targeted employee is a member of a protected classification. Finally, the petitioners emphasize the fact that the three comment cards complained of by the respondents were among forty some cards posted at the same time referencing primarily male employees.

▇ In reviewing the evidence below, we are mindful that this case was presented to a jury for a three-day jury trial, after which the jury found that the respondents presented sufficient evidence to establish a hostile work environment based on gender. As a result,

> [i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983). When we apply these standards to the evidence presented at trial, we find sufficient evidence to support the jury verdict below regarding the presence of a hostile environment based on gender.

First, one of the comment cards referred to Respondent Griffith as a "bitch" which this Court and other courts have found to be a gender-specific pejorative term that can be considered evidence of sexual harassment.

In *Fairmont Specialty v. Human Rights Commission*, 206 W.Va. 86, 95, 522 S.E.2d 180, 189 (1999), this Court indicated that the use of the word "'bitch' certainly has overtones of gender discrimination." *See also Passananti v. Cook Cnty.*, 689 F.3d 655, 666 (7th Cir.2012) ("the word [bitch] is gender-specific, and it can reasonably be considered evidence of sexual harassment"). The petitioners point out Mr. Keifer's testimony that he had called a male co-worker "a lazy, worthless bitch" and had used the term "bitches" to refer to both male and female employees. This evidence, however, does not negate the gender-specific nature of the term "bitch." *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir.2010) (explaining that referring to a man as a "bitch" "insults the man by comparing him to a woman, and, thereby, could be taken as humiliating to women as a group as well"). In the instant case, the gender-specific derogatory term "bitch" was used against the female respondents and constitutes evidence of a hostile work environment based on gender.

A jury could also have found that the language used in the comment cards was gender-biased based on evidence that the two respondents were criticized more harshly than their male counterparts. In addition to the three comment cards that were critical of the respondents, two comment cards were critical of a male employee. One comment card criticizing a male employee provided that

> _____ foreman has a bad attitude when you ask about a truck that you bring in or one that has been sitting there for 1 to 6 months. We need trucks to move metal not a smart a____ answer from the _____ foreman. (He cusses a lot, I don't like that.).

The second comment referring to a male employee stated:

> There is [sic] a lot of dirty and bad batteries in the Battery shop and they also need water. What does the Battery Shop person do besides read magazines and ride around and sell gun raffle tickets. We need someone to take care of the batteries.

It is significant that there are no gender-based epithets or offensive descriptions of these two male employees whereas the respondents were referred to by gender-specific pejorative language and specific parts of their bodies were characterized in a derisive manner. Specifically, the respondents were characterized as "lazy worthless bitches" with "big lazy asses." Therefore, a jury could conclude that while both genders were criticized for their work ethic, the criticism of the respondents was much harsher and of a more personal nature because of their gender.

Moreover, the jury could have inferred that CEO Lager endorsed the offensive criticism of the respondents. The jury could have inferred as much from the fact that CEO Lager posted the comments without adequately redacting the comments both to conceal the identity of the respondents as well as to remove the offensive terms used to describe the respondents.

Finally, there was testimony that after the offensive comment cards about the respondents were posted, the environment in the workplace went from being a friendly, family-type atmosphere to becoming "almost a class thing, almost male against female." The respondents adduced evidence that they were shunned by other employees and scheduled to work only with each other. There also was brief testimony that on one occasion, Ms. Wall was not provided a "fire watch" to assist and watch over her while she was welding, and as a result she was injured. While the evidence indicates that neither the respondents nor the union complained about this conduct to management, the jury may have inferred that CEO Lager's publication of the offensive comments and his silent endorsement of gender-specific pejorative language encouraged an abusive environment based on gender. Therefore, we believe that there was sufficient evidence to support the jury verdict that the offensive treatment of the respondents was based on their gender.

■ The petitioners also contend that the evidence at trial was insufficient to meet the *Hanlon* "severe and pervasive" test for a hostile work environment. Again, we disagree. The offensive comments about the respondents were placed on a bulletin board where plant employees and others coming into and leaving the plant could read them. Also, Sharla Rose, an employee at the plant, testified that she saw the offensive comments on the company intranet after she saw them on the bulletin board. In addition, after the comment cards were removed from the bulletin board, copies of them were disseminated throughout the plant, including being passed around at lunch tables and taped to walls. We find that this evidence is sufficient to meet the severe and pervasive element of a hostile environment sexual harassment claim.

In sum, while the respondents' evidence at trial is far from overwhelming, this Court, giving to the respondents the benefit of all favorable inferences which reasonably may be drawn from the evidence, concludes that the evidence is sufficient to support the jury verdict that the petitioners' wrongful conduct was based on the respondents' gender and was sufficiently severe or pervasive to create an abusive work environment. Accordingly, we affirm the circuit court's order that denied the petitioners' motion for judgment as a matter of law or for a new trial on the jury's finding of liability against the petitioners.

### B. Sufficiency of Evidence to Support Punitive Damages Award

■ In their second assignment of error, the petitioners aver that the circuit court erred in determining that there was sufficient evidence to satisfy the standards for the imposition of punitive damages under the facts of this case.

■ At the outset, we note that our review of whether a punitive damages award was proper involves a two-step inquiry:

When this Court, or a trial court, reviews an award of punitive damages, the court must first evaluate whether the conduct of the defendant toward the plaintiff entitled the plaintiff to a punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895), and its progeny. If a punitive damage award was justified, the court must then examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v.*

*Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *"TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992)[, *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) ]."

Syl. pt. 6, *Perrine v. E.I. Du Pont De Nemours & Co.,* 225 W.Va. 482, 694 S.E.2d 815 (2010). The question of whether the petitioners' conduct toward the respondents entitled the respondents to punitive damages is governed by syllabus point 4 of *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895), which states:

> In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

In its order denying the petitioners' motion for relief from the award of punitive damages, the circuit court reviewed the respondents' evidence adduced at trial and concluded that "the jury could properly have concluded that [the petitioners'] posting of [the comment cards about the respondents] was motivated by malice and criminal indifference to the [respondents'] rights without regard to any basic notion of fairness." The petitioners contend that the facts of this case do not give rise to punitive damages. According to the petitioners, the essential facts are that the petitioners posted a single comment card containing the term "bitch" and three comment cards characterizing the respondents as "lazy." The petitioners posit that while they should have done a better job redacting the comment cards, they immediately removed the cards after two or three days in response to the union's request to do so. Regarding their failure to investigate occurrences of harassment subsequent to the removal of the comment cards, the petitioners emphasize that neither the respondents nor the union made any complaints after the cards were removed.

The respondents reply that their evidence at trial indicates that they were subjected to more than the posting of unflattering comments about themselves. Instead, the posting of the comments with the CEO's endorsement signaled to the respondents' coworkers that it was "open season" on the two women in the workplace whom the CEO agreed were "lazy worthless bitches." In addition, say the respondents, because the petitioners undertook no investigation and corrective action to resolve the problems caused by the posting of the comment cards, the respondents were left on their own and forced to endure hostile workplace conditions for an extended period of time.

As noted above, the circuit court found that the evidence demonstrates the petitioners' malice and criminal indifference to the respondents' rights. With regard to malice, this Court has said that "[t]he foundation of the inference of malice is the general disregard of the rights of others, rather than an intent to injure a particular individual." *Addair v. Huffman,* 156 W.Va. 592, 603, 195 S.E.2d 739, 746 (1973). Because the respondents claimed a hostile work environment based on gender in violation of the Human Rights Act, in order to receive punitive damages the respondents had to demonstrate that the petitioners showed a disregard of their rights as women under the law. Similarly, in order to show criminal indifference to civil obligations affecting the rights of others, the respondents had to demonstrate that the petitioners acted with knowledge that they may be violating the respondents' rights as women under the law. *See Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (finding that Title VII's requirement of showing "malice" or "reckless indifference to the federally protected rights of an aggrieved individual" in order to qualify for punitive damages means the complaining party must demonstrate that the employer discriminated "in the face of a perceived risk that its actions will violate federal law").[5]

---

5. This Court indicated in *Human Rights Comm'n v. Wilson Estates,* 202 W.Va. 152, 158, 503 S.E.2d 6, 12 (1998), that "Title VII is the federal analogue to our Human Rights Act." Also, this Court has a "longstanding practice of applying the same analytical framework used by the federal courts when deciding cases arising under the Human Rights Act." *Id.* (citation omitted).

While the respondents met the standard for establishing a right to compensatory damages, we find that they failed to meet the higher standard required of plaintiffs in order to qualify for punitive damages under the Human Rights Act. *See Kolstad*, 527 U.S. at 534, 119 S.Ct. 2118 ("Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award."). The evidence in this case simply fails to indicate the kind of repeated and continuing wrongdoing by the employer that demonstrates the employer's criminal indifference to the rights of women in the workplace recognized by the Human Rights Act. For this reason, we find that the circuit court erred in denying the petitioners' motion for judgment as a matter of law on the issue of punitive damages.

## IV. CONCLUSION

For the reasons stated above, this Court affirms the September 3, 2013, order of the Circuit Court of Jackson County to the extent that it denied the petitioners' motion for judgment as a matter of law or for a new trial on the respondents' award of compensatory damages for their hostile work environment claims. However, we reverse the circuit court's order to the extent that it denied the petitioners' motion for judgment as a matter of law on the respondents' award of punitive damages.

Affirmed, in part, and reversed, in part.

Justice DAVIS and Justice WORKMAN concur in part and dissent in part and reserve the right to file separate opinions.

Justice KETCHUM and Justice LOUGHRY concur in part and dissent in part and reserve the right to file separate opinions.

DAVIS, Justice, joined by WORKMAN, Chief Justice, concurring, in part, and dissenting, in part:

While I agree with the plurality's resolution of the issue in the case *sub judice* affirming Constellium's liability for a hostile work environment, I disagree with the portion of the opinion concluding that the facts were insufficient to support an award of punitive damages. Because I believe there was adequate evidence to support the jury's decision on punitive damages, I respectfully dissent from the plurality's contrary conclusion.

In its decision of this case, the plurality correctly deferred to the jury's conclusion that Constellium subjected Ms. Griffith and Ms. Wall to a hostile work environment based on their gender. This result is in accord with the applicable legal precedent. *See* Syl. pts. 5 and 8, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995) (setting forth factors to establish a claim based upon hostile work environment and reiterating employers' duty to ensure workplaces free of sexual harassment). Over a three-day period, the jury heard all of the conflicting facts in this case. This Court, in the majority, correctly respected the work of the citizens of Jackson County, West Virginia, and affirmed their decisions as to Constellium's liability for a hostile work environment. The jury verdict was based on weighing the evidence, resolving questions of fact, and making credibility determinations—such conclusions that are in the exclusive province of the jury. *See* Syl. pt. 2, *Skeen v. C & G Corp.*, 155 W.Va. 547, 185 S.E.2d 493 (1971) ("It is the peculiar and exclusive province of a jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury upon such facts will not ordinarily be disturbed."). Thus, I concur with the plurality opinion's confirmation of the jury's determination that Constellium was liable for the hostile work environment suffered by both Ms. Griffith and Ms. Wall.

The plurality opinion departs from logic, however, when the majority reverses the punitive damages award in a short-shrift two-paragraph discussion. In this brief two paragraphs, the majority totally ignores the well-established law in this State on punitive damages and jury awards. Instead, the majority relies upon the United States Supreme Court's decision in *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), with no discussion of that case, to support its decision to reverse

the jury award of punitive damages because the respondents "failed to meet the higher standard required of plaintiffs in order to qualify for punitive damages under the Human Rights Act." The majority then summarily determines that "[t]he evidence in this case simply fails to indicate the kind of repeated and continuing wrongdoing by the employer that demonstrates the employer's criminal indifference to the rights of women in the workplace recognized by the Human Rights Act."

This reasoning defies both the facts and the law—especially in light of the fact that the jury was properly instructed on punitive damages,[1] and the jury surmised that Ms. Griffith and Ms. Wall were entitled to receive punitive damages based on the evidence presented. Further, Constellium filed post-trial motions, including a request for a review of the punitive damages award. The trial court conducted a hearing, resulting in the final appealable order, which stated: "[f]rom this evidence and all the other evidence adduced at trial, this jury, being a rational trier of fact, had sufficient evidence before it to conclude that [Constellium's] conduct was reprehensible and warranted the imposition of punitive damages." My personal review of the appendix record submitted on appeal, including the resultant order of the circuit court, convinces me that the lower court properly considered all of the relevant factors in its review of the punitive damages award, and, accordingly, such award was proper.

This Court's guiding principles regarding punitive damages are stated as follows:

> Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to a punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine *if the* punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

Our well-settled law states that "[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." Syl. pt. 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895). Moreover, we have held that "the recovery of both emotional distress damages (where such distress, of course, is proven) and punitive damages (where the employer's misconduct is sufficiently egregious to meet the standards established in our punitive damages jurisprudence) has been held to be authorized in employment law cases generally." *Sheetz Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 209 W.Va. 318, 337, 547 S.E.2d 256, 275 (2001).

With respect to this specific case, the CEO's intentional publication of the comment cards with identifiable and derogatory information regarding Ms. Griffith and Ms. Wall, along with the posted responses that failed to repudiate the disparaging and sexist nature of the comments, illustrates reprehensible conduct. Additionally, Constellium made no attempt to determine who had made the negative comments and, further, failed to discipline the author or take ANY actions once the author confessed. The gender-based language in the comment cards imposes upon Constellium a duty to investigate and take effective action to correct the problem. *See* Syl. pt. 3, in part, *Fairmont Specialty Servs. v. West Virginia Human Rights Comm'n*, 206 W.Va. 86, 522 S.E.2d 180 (1999) ("When such instances of aggravated discriminatory conduct occur, the employer must take swift and decisive action to eliminate such conduct from the workplace.").

While Constellium seeks to frame this case as one in which there was no harm, such an argument fails based upon the evidence. Ms. Griffith and Ms. Wall endured a hostile work environment that was, in part, created or added to by the CEO's responses to gender-based slurs toward the respondents. Not

---

1. Indeed, while Constellium objected to the issue of punitive damages before the trial court, no objections were made to the actual content of the jury instructions regarding the same.

only did the CEO's statements actively participate in the degeneration of the work environment, but also, the CEO's reaction seemed to confirm the slurs contained in the original complaints. Forty-three comments and responses were posted at the same time, including the relevant three comments in the present case. The majority of these comments did not involve gender at all. Only four comments used gender-specific information—the three at issue herein and one comment that was directed toward a male. In the one instance where male gender was designated, no gender-based slurs were in the comment. The CEO's response thereto, however, was to chastise the commenter and to state that everyone needs to respect each other. Conversely, the only gender-based epithets were directed at Ms. Griffith and Ms. Wall. Notwithstanding the gender slurs in the comment cards, the CEO's responses seemed to scold the women and stated that they all needed to be a team player. The response to the comment encouraged the women to be "fully engaged and productive" as opposed to any attempt to correct or ameliorate the poor language used by the commenter.

Importantly, Constellium's argument that Ms. Griffith and Ms. Wall were not harmed by the work environment completely ignores the facts. The trial testimony was that the women were shunned by their coworkers, either through being ignored completely or through employees changing lunch rooms to avoid contact. The evidence also showed that other workers passed around copies of the comments and responses and taped them to shower walls. The women also felt that the men no longer wanted to work with them and that they were scheduled to work only with each other. Notably, one of the women was injured while at work because she did not have a fire watch while she was welding. Ms. Griffith and Ms. Wall have experienced this negative environment for the entire tenure of this litigation. Importantly, the jury was presented with evidence regarding the nature of the harms experienced by Ms. Griffith and Ms. Wall following the decline in their employment situation. The evidence at trial was sufficient for the jury to reasonably find that Constellium's actions warranted an award of punitive damages, and this Court's review should have reached the same result.

Had the majority of this Court correctly determined that punitive damages were appropriately assessed against Constellium, we would then "examine the amount of the award pursuant to the aggravating and mitigating criteria set out in *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and the compensatory/punitive damage ratio established in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992)." Syl. pt. 6, in part, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W.Va. 482, 694 S.E.2d 815 (2010). In considering the amount of the punitive damages to award, the trial court properly instructed the jury on all factors to consider.[2] Upon Constellium's request that the punitive damages award be reviewed, the trial court held a hearing and set forth a written order

2. *See* Syl pt. 3, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) ("When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows: (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater. (2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him. (3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant. (4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages. (5) The financial position of the defendant is relevant.").

considering all of the pertinent law, and affirmed the jury's award.[3] This Court's review of the punitive damages award should have resulted in an affirmation of the same.[4] This Court recently reaffirmed the viability of the *Garnes* factors in determining whether a punitive damages award is excessive. *See generally Quicken Loans, Inc. v. Brown*, No. 13–0764, 236 W.Va. 12, 777 S.E.2d 581, 2014 WL 6734107 (Nov. 25, 2014).

As a final matter, the ratio of compensatory damages to punitive damages is 1 to 1, which is well-within acceptable limits. *See* Syl. pt. 15, *TXO Prod. Corp. v. Alliance Res. Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) ("The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not *per se* unconstitutional."). Each respondent was awarded $250,000 in compensatory damages and $250,000 in punitive damages. Such a result was well-supported by the facts, and the jury was reasonable in its conclusions. From this Court's contrary conclusion involving the initial question of the availability of punitive damages, I respectfully dissent.

Accordingly, I concur in the majority's resolution of the issues regarding Constellium's liability for exposing Ms. Griffith and Ms. Wall to a hostile working environment, but I respectfully dissent from its rejection of the punitive damages award. I am authorized to state that Chief Justice Workman joins me in this separate opinion, concurring, in part, and dissenting, in part.

KETCHUM, Justice, concurring in part and dissenting in part:

There was no viable cause of action for either compensatory damages or punitive damages. In order for a plaintiff to prevail on a claim for gender discrimination or sexual harassment it must be proven that the alleged wrongful conduct was based on the plaintiff's sex. *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995). In this case, the defendant's alleged wrongful conduct was directed both at men and women.

*7 All employees were encouraged to place comments in a suggestion box. The plant manager would attach his response to every comment. The comments and responses were posted on a plant bulletin board. When the comments and responses about the plaintiffs were posted, there were also posted approximately thirty nine other comments and responses.[1] There were postings that had derogatory comments about both male and female employees, including a foreman.

---

**3.** *See* Syl. pt. 4, *Garnes*, 186 W.Va. 656, 413 S.E.2d 897 ("When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors: (1) The costs of the litigation; (2) Any criminal sanctions imposed on the defendant for his conduct; (3) Any other civil actions against the same defendant, based on the same conduct; and (4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff. Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of

the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.").

**4.** *See* Syl. pt. 5, *Garnes*, 186 W.Va. 656, 413 S.E.2d 897 ("Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.").

**1.** At the initial oral argument, it was not disputed that forty two comments and responses were posted at the same time. Three of those comments were about the plaintiffs.

While it was ill advised to post derogatory comments about any employee, these comments were not directed at only the female plaintiffs or female employees. They were equal opportunity postings directed at both men and women. Additionally, the comments about the plaintiffs were directed at their perceived work ethics.

There is no cause of action under our sex discrimination laws. Our anti-discrimination laws are not codes of civility. Our laws are aimed at discrimination directed at a protected class, not comments directed at anyone in the work place.

Therefore, I dissent.

I concur in the striking of the punitive damages only because there can be no punitive damages when there is no evidence supporting compensatory damages. The evidence in this case did not support a viable cause of action for compensatory damages, much less, punitive damages to punish the defendant. I do not accept the majority opinion's legal reasoning in striking the punitive damages, but agree there can be no punitive damages awarded.

Syl. pt. 7, *Alkire v. First Nat'l Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996). Therefore, the first consideration is whether the conduct at issue herein is sufficient to expose Constellium to punitive damages for its actions toward Ms. Griffith and Ms. Wall.

LOUGHRY, Justice, concurring, in part, and dissenting, in part:

I once again express my staunch disagreement with the majority's baseless conclusion that the respondents advanced a viable gender discrimination claim. Faced with an opportunity on rehearing to correct its initial mishandling of this verdict, a majority of this Court refuses to apply well-established principles of employment law and common sense, as more fully explained below.

At the outset, let me be clear that my concurrence is limited *strictly* to the striking of punitive damages due *solely* to the absence of an actionable claim in the first instance. In no way do I subscribe to the majority's pretextual analysis regarding the punitive damages claim inasmuch as there is quite simply no claim upon which damages of any type-punitive or otherwise-may be awarded. In my view, the majority's substantive analysis in support of striking the punitive damages is a thinly veiled attempt to mask the plainly inadequate claim advanced by the respondents and obscure the majority's empty analysis in support of it. Striking punitive damages does nothing to "cure" the injustice occasioned by this verdict, and I will not subscribe to a false analysis of damages which should not exist in the first instance. With every word in support of striking punitive damages, the author of this plurality opinion [1] underscores the meritless nature of the gender discrimination to which the author lends his unqualified support.

Concerning the issue of the viability of the gender discrimination claim, let me reiterate that while I emphatically agree that the language utilized by Mr. Keifer in the original comment cards was without question both highly inappropriate and certainly an unacceptable manner of referring to a female co-worker, regardless of the context or situation, the incivility at issue in this case did not rise to the level of proof necessary to establish a claim of gender discrimination, sexual harassment, or hostile work environment. Highly significant is the fact that in affirming the jury's verdict as to compensatory damages, the majority fails to cite a single factually analogous case. This omission, especially considering the vast federal and state jurisprudence addressing allegations of workplace discrimination, signals loud and clear that the evidence in this case was woe-

---

1. Inasmuch as I concur in the result only as it pertains to punitive damages and do not concur in the rationale advanced by the author, the analysis as to punitive damages does not "enjoy[] the assent" of three Justices and is therefore, as to that aspect, a plurality opinion. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citing *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909,

49 L.Ed.2d 859 (1976)). As we previously explained, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [a majority of] Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ...' " *State v. Kennedy*, 229 W.Va. 756, 735 S.E.2d 905 (2012) (citations omitted).

fully inadequate to sustain the respondents' claims.

In this case, the respondents were subjected to three written, anonymous comment cards, which contained redacted epithets that referred to them individually, or collectively, as a "lazy worthless b_____" and a "lazy a_____." These comment cards were posted by the employer one time on a bulletin board alongside numerous other comment cards and other unrelated employment postings, and they were taken down immediately after only a couple of days. These comments were treated in precisely the same manner as similar comments that were directed toward male employees—redacted for employee name and profanity and responded to by the employer in a gender-neutral fashion with regard to the substance of the comment. Moreover, testimony was adduced that the respondents, who claim to be victims of gender discrimination, often used "rough language" while at work, such as "b*tch," "sh*t," and "d*mn," and referred to each other as "lazy b*tches" and to other employees as "a* *hole," "qu*er," and "little bald-headed pr*ck."

It is well-accepted in federal jurisprudence[2] that "the use of a gender-specific term in a derogatory comment does not necessarily indicate that the comment is directed at the person's gender." *State v. Franklin*, 341 S.C. 555, 534 S.E.2d 716 (App.2000); *see Johnson v. Waters*, 970 F.Supp. 991 (M.D.Ala.1997) (holding that use of derogatory term, standing alone, is not necessarily direct showing of discrimination, but rather must be considered in context of its use); *Kriss v. Sprint Comm'ns Co.*, 58 F.3d 1276, 1281 (8th Cir.1995) (concluding that use of term "bitch" did not indicate "a general misogynist attitude" as it was directed at only one woman and thus was not "particularly probative of gender discrimination"); *Blankenship v. Warren Cnty. Sheriff's Dept.*, 939 F.Supp. 451 (W.D.Va.1996) ("Even though the term 'bitch' is usually offensive, it is not necessarily gender-based."); *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168

(7th Cir.1996), *overruled in part on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (calling someone "bitch" fails to establish conclusively that such harassment "was motivated by gender rather than by a personal dislike unrelated to gender"); *Panelli v. First American Title Ins. Co.*, 704 F.Supp.2d 1016 (D.Nev.2010) ("Use of the word, 'bitch,' standing alone, is not sufficient to show gender bias."); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513 (D.C.Cir.1995) (considering plaintiff's evaluation by supervisor that she was a "bitch" in conjunction with accompanying commentary that plaintiff was "extremely difficult on secretarial and support staff" as stating gender-neutral concerns about plaintiff's interpersonal relations with co-workers, rather than discriminatory considerations); *Williams v. KETV TV, Inc.*, 26 F.3d 1439, 1441 n. 2 (8th Cir.1994) (affirming judgment for employer on charge of sex and race discrimination despite evidence at trial that personnel involved in hiring decision referred to plaintiff as "black bitch"); *Moulds v. Wal-Mart Stores, Inc.*, 935 F.2d 252, 253–54 n. 1, 256–57 (11th Cir.1991) (affirming judgment for employer on sex and race discrimination charge despite evidence that employer told plaintiff she would have to be more of a "bitch" to become manager); *Bressner v. Caterpillar, Inc.*, 2008 WL 345550, at *4 (C.D.Ill. Feb. 7, 2008) (finding that "[n]o jury would find that referring to a woman as a 'bitch,' even a 'f*cking bitch,' ... is evidence of a discriminatory intent.").

As the Eighth Circuit explained in *Kriss*:

While these comments are rude, they do not furnish much proof of gender discrimination. Calling a particular person ugly or using an epithet characterizing a person as unpleasant is not particularly probative of whether someone would refuse to promote someone else for improper reasons. Specifically, the word "bitch," it seems to us, is not an indication of a general misogynist attitude. Rather, it is a crude, gender-

---

**2.** This Court has repeatedly held that we analyze cases brought under the Human Rights Act consistent with the manner in which federal antidiscrimination laws are applied, barring statutory distinctions or other compelling reasons. *See Hanlon v. Chambers*, 195 W.Va. 99, 112, 464 S.E.2d 741, 754 (1995).

specific vulgarity, which in this case was directed toward only one woman, rather than women in general. (We note the existence of many vulgar epithets that are used only of men that, we believe, would not be indicative of animus against males.). 58 F.3d at 1281. Similarly, in the case at bar, the mere fact that Mr. Keifer is male and the respondents are female is not indicative of gender bias. *See also Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 282 (4th Cir. 2000) ("Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion."); *Phillips v. Raytheon Applied Signal Technology, Inc.,* 2013 WL 5440802 (D.Md.2013). Likewise, the law does not "blindly ascribe" gender animus to all conflicts between men and women, particularly when the source of the conflict is gender-neutral. In this case, it is perfectly clear from a plain and objective reading of the comments that the source of Mr. Keifer's vitriol was not the respondents' gender but his perception that the respondents are lazy. Further, his complaints of alleged laziness were corroborated by very fact-specific instances of the respondents' purported workplace indolence-none of which had anything to do with the fact that they were women.

The majority's decision in this case is as baseless as that once bemoaned by my colleague Justice Davis in *Fairmont Specialty Services v. West Virginia Human Rights Commission,* 206 W.Va. 86, 522 S.E.2d 180 (1999). As Justice Davis aptly stated in her dissent:

> Where the majority goes seriously astray is in its fundamental misconception that anti-discrimination laws were intended to completely eliminate any and all bickering and even profanity from the workplace. As the United States Supreme Court has made clear, "Title VII does not prohibit all verbal or physical harassment in the workplace." Rather, it is directed only at prohibited discriminatory conduct.

206 W.Va. at 99-100, 522 S.E.2d at 193-94 (Davis, J., dissenting) (citations omitted). The majority, now joined by Justice Davis, finds itself veering seriously astray of established employment law principles. As the United States Supreme Court has stated:

> We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely *because the words used have sexual content or connotations.* "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and emphasis added).

"[F]ederal as well as state anti-discrimination laws are not codes of civility. Employers, much as they would like, simply cannot rid the workplace of all instances of inappropriate employee behavior." *Fairmont Specialty,* 206 W.Va. at 103, 522 S.E.2d at 197 (Davis, J., dissenting) (citations omitted). The alleged discriminatory activity in this case was so fleeting, isolated, and legally inconsequential that I am forced to echo the sentiments of Justice Davis fifteen years ago when she poignantly queried: "And we wonder why it is so difficult to attract new employers to this State?" *Id.* at 103, 522 S.E.2d at 197.

Therefore, for the reasons stated above, I respectfully dissent to the majority's decision to uphold the award of compensatory damages based on its erroneous conclusion that the respondents established a viable gender discrimination claim. For that same reason, and that reason alone, I concur that punitive damages must be stricken from this verdict.